# EXHIBIT DD

**Page 33**

...rsiglia, the day actually of the incident, if I can ...rify, that Officer Corsiglia was overheard saying ...t they had an issue with this fella the day before.

Up to that point, we were just dealing ...h an attempted suicide in the cell of Mr. Keifer. ...d a supervisor actually overheard Officer Corsiglia ...ke the comment. That, in turn -- as we were working ...the suicide portion of the 27th, once that ...ormation came to my office afterwards, then we went ...ck to the 26th to find out what happened.

Q. Okay.

A. Because it kind of -- I viewed it as it ...d in somewhat to the 27th.

Q. All right. Who was the supervisor that ...egedly overheard Mr. Corsiglia?

A. I believe it was Sergeant Repsch.

Q. And how did you learn about Sergeant ...psch overhearing this information?

A. I believe Sergeant Repsch contacted me ...d he was having the reports -- or Officer Corsiglia ...te a report. And that's how we actually acquired ...reports of Officer Corsiglia and I believe of ...icer Corsiglia as well.

Q. Okay. When did you learn that Officer

**Page 34**

...rsiglia was overheard making this statement?

A. On the 27th. It was following the ...ident.

Q. The same day?

A. On the 27th, yes. Yes, sir.

Q. Okay. And was that in a report from ...rgeant Repsch or did he just call you? How did it ...ppen?

A. It may have been an initial phone call ...t then a report. I know he was acquiring the ...orts.

Q. Okay.

A. And he may have written an email or a ...ort as well.

Q. All right. And Mr. Klinovsky, I don't ...nt to necessarily test your memory but things that, ...u know, recall independently, I'd like you to tell ...e. If you need to refer to your report, just let us ...ow and that's okay, too. Okay?

A. Okay.

Q. So what did you do when you first got ...is assignment?

A. Basically just acquired all the ...ormation. The supervisors have a checklist that

**Page 35**

1  they have to go through. And they acquire -- they
2  know what paperwork that I need at that point. They
3  in turn acquire that paperwork. They get it to my
4  office for review.
5    Q.  And what is that paperwork?
6    A.  It could be like the block logs, any UA
7  reports from that day, unusual activity reports,
8  excuse me, from officers that responded to the code.
9  Who was involved in the code. It could be reports
10 from medical, for the first responders, you know,
11 going there. But all the reports from everybody that
12 was involved or going to that incident that particular
13 day, at that time.
14   Q.  Okay. So after you directed the
15 supervisors to get you these items that you needed,
16 what did you do next?
17   A.  It comes to my office. I try to put
18 everything down, go through it, review it, going in
19 chronological order. Ensure that the police were
20 notified and ensure that nobody has gone in the cell.
21 That they cordoned everything off. I'll pull video.
22 Check phone calls. You know, pull phone calls if I
23 have to.
24   Q.  What video did you pull on this occasion

**Page 36**

1  regarding Mr. Keifer?
2    A.  It would have been from the cell he was
3  in, more than likely. Well, no. He wasn't in a
4  camera cell, I don't believe. But it would have been
5  from the day room area. There's, I believe up to six
6  cameras in the day room area. And I would pull video
7  of anything that was targeted for that section.
8    Q.  And is there a camera that shows the
9  hallway outside of the cell where Mr. Keifer was
10 housed?
11   A.  I believe so.
12   Q.  All right. Did you pull that video also?
13   A.  Yes. I would have pulled any video as
14 part of that.
15   Q.  And do you recall how far back you pulled
16 that video --
17   A.  No.
18   Q.  -- back from the incident?
19   A.  No, I do not.
20   Q.  Do you know if it was more or less than
21 an hour?
22   A.  It could have been. I just don't recall.
23   Q.  You don't, okay. All right. Other than
24 the things you have already told me -- get the

## Page 37

ports and get the video -- what else did you do?

A. Basically I put that together. Start tting it in a format. I check with the police to d out, you know, if they're done, what they're ing, is the cell cleared.

You know, and once we get through all at stuff, now a lot of times I'll ask the police if ey can provide me reports. And more than likely ey'll tell me it's under investigation and more than ely they won't provide those reports to me ectly.

I'll go ahead and start talking to people at were directly involved in the incident. Or if I ve somebody to assist me, you know, I'll advise em, hey, could you met with this person or that rson. And we'll discuss it.

And once that's done, we put that ormation together or acquire addendum reports from ose officers or staff, depending on who showed up r the incident, and then we'll put that together. t it in a format. I'll review it to again make a nclusion and make recommendation to the warden on a riety of different things.

Q. So who did you interview in this case?

Keenan Reporting Service
(717) 665-4060

## Page 38

A. I'm almost sure I talked to Officer rningstar. I remember, I recall talking to him at me point. I know Officer Corsiglia and I know ficer Christner, I talked to both of those people.

Q. Now other officers that may have been on e block at the time of the discovery, such as Cormick, did you speak with him?

A. I may have. I just don't recall.

Q. Okay. Is that something you would ypically do, speak to the individual who discovered he individual hanging?

A. Normally, yes. Normally, yes, I would. he ones that were directly involved I would have alked to.

Q. Okay.

A. With Officer McCormick, I just don't ecall. And also in this case here, and towards -- nce Warden Guarini left, before I was kind of, let go o do the investigation on my own.

After Warden Guarini left and the other wardens came in, more people were involved in kind of ssisting. It could have been Officer Barley, it ould have been one of the deputy wardens.

And so although I'm kind of trying to

Keenan Reporting Service
(717) 665-4060

## Page 39

1  coordinate things, okay, from how I'm used to doing
2  it, there's also other people involved and I'm trying
3  to acquire stuff from them as well.
4      Q.   Is it your experience that those
5  individuals would prepare their own investigation
6  report?
7      A.   No.
8      Q.   They would just contribute to yours?
9      A.   Correct.
10     Q.   Okay. Tell me about your interview with
11 Corrections Officer Morningstar.
12     A.   What I recall with talking to Officer
13 Morningstar, he was somewhat upset following the
14 incident. I remember talking to him. That he, I
15 believe he was, he had moved -- he was upset because
16 he had moved Inmate Keifer from one cell to another.
17 And, but it was under the fact that I believe it was
18 MH/MR Wickizer had met with Inmate Keifer earlier, I
19 believe, that day, the 27th, and made a verbal
20 notification to Officer Morningstar that he was going
21 to be placing him on general population status.
22          I don't believe that Mr. Wickizer had put
23 that out yet in written form, but he made verbal
24 notification to Officer Morningstar.

Keenan Reporting Service
(717) 665-4060

## Page 40

1           And I was trying to tell Officer
2  Morningstar, well, you got verbal notification from
3  MH/MR that he was going to general pop. And because
4  of that is why Officer Morningstar moved him, because
5  he was apparently supposedly having problems with his
6  other cellmate.
7      Q.   Okay. So what is the procedure that's
8  supposed to be followed with regard to the
9  transferring of an inmate from one cell to another in
10 a situation like that?
11     A.   It's an officer's call in that regards,
12 as long as the officer has checked.
13     Q.   Checked what?
14     A.   It would be pass-on notes in their book
15 at their station, and also with mental health or
16 medical, to ensure that they're not on a specific --
17 now I believe he might have been on a status of some
18 sort. PO, I think, observation status, maybe at the
19 time. But he was cleared, verbally cleared from that
20 by Mr. Wickizer for general population.
21          And that's okay. If you get that verbal
22 notification that's fine. But as long as, you know,
23 normally the MH/MR person would document that and make
24 notification. And I can't recall what the name of it

Keenan Reporting Service
(717) 665-4060

41

I know it's on -- through the email system, cause the supervisors would acquire it to say they've notification that this change has been done. And is person's off status.

Q. So the documentation that the mental ealth staff should do, is that something that's sent the corrections staff on the block where the imate's housed?

MS. MINEHAN: Objection to the form.

Y MR. ALLEN:

Q. Do you understand the question?

A. They would, the supervisors would be otified. It may be a verbal notification to them, ot via, like email. They would have access to that that point in time.

Q. Okay. I'm just trying to understand the rocedure. So if mental health was to release omebody or change status, I should say.

A. Yes.

Q. What is your understanding of the steps hey should take?

A. They would go back to their office. They ould make a notation on the system. I just can't ecall what the system's called.

Keenan Reporting Service
(717) 665-4060

42

Q. Okay.

A. They would make a notification on this hing. The emails would go out to the supervisors, he correctional supervisors, to advise them of what's oing on.

Normally they would make verbal otification to the officers on the unit that this erson is going from this status this status. And the fficer would make the change, either on the board or, nd in the book.

Q. Okay. What book?

A. It's a pass-on book. It's just a standard book to -- that every officer reads coming on duty, or reads throughout their shift to read, to look to see what occurred in the past.

Q. How far back does the book go?

A. I believe they collected them every 30 days. Every 30 days they would collect the paperwork. The paperwork would go to the supervisor's office and I believe there was a sergeant assigned to do that. And at that time I believe it was Sergeant Aberts.

MR. MACMAIN: Kevin, if you want him to refer to documents, I think they're called DOJs. Do you want him to look at those?

Keenan Reporting Service
(717) 665-4060

43

1  MR. ALLEN: If he wants to, that's fine.
2  MR. MACMAIN: I'm putting in front of the
3  witness a packet within the larger packet that counsel
4  identified, LCP-000919. And I believe this is the
5  computer generated change of status form that you were
6  referring to.
7  THE WITNESS: Correct. Yes.
8  MR. MACMAIN: Okay. 919. Yes. And
9  just, actually, I think all this status -- do you know
10 what DOJ stands for?
11 THE WITNESS: I'm not sure.
12 MR. MACMAIN: Okay. But they all are in
13 --
14 THE WITNESS: When you said DOJ, that
15 rang a bell.
16 MR. MACMAIN: Okay. Doctors Order to
17 Jailer, I think.
18 THE WITNESS: Yeah, I believe so.
19 MR. MACMAIN: And they're all just,
20 counsel, they're all contained, at least for Mr.
21 Keifer, 916, 917, 918 and 919.
22 BY MR. ALLEN:
23 Q. And the DOJs, do they say who they're
24 from, or is it just from the server?

Keenan Reporting Service
(717) 665-4060

44

1  A. I know it goes to all people listed under
2  that prison DOJ status. And I know the supervisors
3  were under that and I believe administration as well.
4  But I know the supervisors for sure because they would
5  acquire it and ensure that the necessary changes were
6  made.
7  Q. Okay. Can we tell from this DOJ though
8  who the message is from?
9  A. No. Oh, wait a minute. COR-EMR.
10 Q. That's the server system with the prison?
11 A. Yes.
12 Q. Let's go back to the pass-on book for a
13 second. Do you, in the course of your investigation,
14 typically look at the pass-on book?
15 A. Yeah, I'll pull pages and copy those
16 pages from the pass-on book.
17 Q. Okay. And how do you do that?
18 Physically pull them out of the book?
19 A. I would contact the supervisor to pull
20 those pages out, if there's any remarks in them
21 concerning the incident or concerning something that
22 happened possibly before that, and copy those as part
23 of our report packet.
24 Q. How far back would you typically look?

Keenan Reporting Service
(717) 665-4060

## Page 45

A. It depends on what's actually in there, it's anything related to the incident.

Q. And did you do that in this case, did you pull the pass-on book?

A. I may have. I don't recall.

Q. Is it your typical practice to do it, or?

A. Yes.

Q. Okay. Would you have any record of whether you did it or not?

A. Only if it's in one of the report packets.

Q. If you had pulled a pass-on book, is that something that you scan into the computer?

A. Yes.

Q. Okay. And by the way, do you scan in all of the reports that are provided as in the course of your investigation?

A. Yes. All the reports that, the packets that you have, all those would have been scanned into my, onto my computer, in a file on my computer.

Q. Okay. I don't see any mention of a pass-on book. And I'm just wondering, when you reviewed this, did you see mention of a pass-on book?

A. Not that I saw. It could have been that

Keenan Reporting Service
(717) 665-4060

## Page 46

there was nothing in there specific.

Q. Okay.

A. You know, with regards to any red flag that showed anything, that I would have been, you know, privy to, to move forward on.

Q. Did you ask Mr. Morningstar whether he reviewed the pass-on book?

A. I don't recall.

Q. Okay. Do you recall whether he told you that he reviewed the pass-on book?

A. I don't recall. Sorry.

Q. That's all right. What happens to the pass-on books when they're full?

A. Well, they're never really full. They continue on. They're ongoing, if you will.

Q. They're in like a loose-leaf binder or something?

A. It's in a binder-type form. And then at the end of that 30-day period a supervisor will collect the data out of that and then take it to the supervisor's officer.

And I -- at one point I think they kept the hard copies but then I think they may have started scanning them in at some point. I don't know what

Keenan Reporting Service
(717) 665-4060

## Page 47

they do with them now.

Q. Well, back to when you worked there. You left in October of 2015?

A. Yes.

Q. So were they scanning them in then?

A. I believe they were.

Q. How about in December 2014?

A. I'm not certain.

Q. Okay. We were talking about your interview with CO Morningstar and, I'm sorry, I went off on a tangent there. Tell me what else you and Mr. Morningstar talked about.

A. What I recall is the fact that he was upset with regards to the move, ensuring that he did it, he was okay, doing the right thing.

And as long as -- my thing was as long as he was verbally notified by Mr. Wickizer that the change was coming, and he was already having an issue in his cell, there were no other red flags from Mr. Wickizer with regards to review, then I didn't see an issue with him being moved to the cell, with what Officer Morningstar did.

Q. When did you interview Mr. Morningstar?

A. I'd have to look.

Keenan Reporting Service
(717) 665-4060

## Page 48

Q. That's okay. You can look.

A. Yeah, I'm not certain specifically of when I talked to him. I know it was following the incident. It could have been that day or it could have been a day or two after that.

Q. Had he prepared his report at the time you spoke to him?

A. I think he had already written a report.

Q. Okay.

A. At that point.

Q. All right. I'll show you, ask you to take a look at Klinovsky Exhibit 2 at page 852. Toward the end of the packet, maybe the second or third to the last page. And just so we can identify that, it looks like page 852 appears to be a report from Officer Morningstar?

A. Yes.

Q. Dated December 28, 2014 at 8:13 in the morning?

A. Yes.

Q. Does that help you with regard to when you may have interviewed Mr. Morningstar?

A. More than likely it was after this report was received.

Keenan Reporting Service
(717) 665-4060

49

Q. Okay. At the time you interviewed Mr. Morningstar, were you aware of the allegations that Mr. Keifer allegedly had been trying to harm himself on the 26th of December?

A. I don't recall whether I knew about it at that particular time. I didn't see the report from Repsch in here. In a report from Repsch, that would tell me when.

Q. That would tell you when?

A. That would tell me when. I remember Sergeant Repsch is the one that acquired the information from Corsiglia near the supervisor's office. It may have been around the time clock. It was a comment that Officer Corsiglia had made that Sergeant Repsch apparently overheard.

And when Sergeant Repsch said, what do you mean by that? Then Officer Corsiglia said that, hey, we had an issue with this guy the day before. And that's how those reports ended up being generated.

Q. Okay. Did, to the best of your recollection did Officer Morningstar know at the time of your interview that Mr. Keifer had attempted to harm himself the day before?

A. I'm not sure. I'm not sure whether he

50

actually had any direct knowledge of that.

Q. Okay. Anything else that you recall about the interview with CO Morningstar?

A. No.

Q. What did you next do then?

A. I may have met with other people. I may have talked to Officer Barley. Again, collecting reports, you know, trying to put this together.

Once I found out the information from Sergeant Repsch, we went back a day to acquire video. Again, my concern was to try to acquire the video so we didn't lose any video from the 26th, since it kind of pushed it back a day, because I wanted to review that, based on Officer Corsiglia's comments.

Q. Okay.

A. And I remember going back to review that video with regards to -- to see if the cell check -- my concern was -- the report -- I remember the reports we had received stated that nothing was found in the cell.

We reviewed the video and it appeared that something was found. It appeared in my mind, and in my view of it, it appeared to be a sheet, which the inmate, Inmate Beattie, I believe it was, advised

51

Officer Corsiglia that it was, that he had a ripped sheet or torn sheet in the cell. And that Inmate Keifer was attempting to choke himself out or, you know, black himself out from choking himself out. So I went back to the video.

Q. Okay. Before I get to that video, did you review the video leading up to the discovery of Mr. Keifer on the 27th?

A. I'm sure I -- believe I did. Yes.

Q. All right. Did you retain that video?

A. Yes.

MR. ALLEN: All right. Let's go off the record just a second.

(Discussion off the record.)

MR. MACMAIN: Back on the record. We just were off the record. We were discussing, I guess, videos for the hours leading up to the discovery of Mr. Keifer.

Kevin had inquired if there was additional video. We did check and were able to, I guess, get a bunch of other video for the hours prior. My associate has represented there is nothing on there of any significance. And the major who did the investigation said that if there was anything of

52

significance, either negative or positive on those videos that he reviewed, they would have been noted in his reports and saved as part of this original investigation packet.

So given that they weren't, I think we're making the assumption -- actually, asking the major, that would indicate to you there was nothing significant about checks not being made or anything?

THE WITNESS: Yeah. There was no appearance of any check issue, as far as 15-minute checks -- or not 15, but 30-minute checks at that point.

MR. MACMAIN: Okay.

BY MR. ALLEN:

Q. And if there had been some irregularity with regard to the checks, is that something that would have been included in your report?

A. Yes.

Q. Okay. You mentioned that you pulled the video from December 26th, 2014?

A. Yes, sir.

Q. Prior to reviewing the video did you interview either of the officers, like Christner or Corsiglia?

Keenan Reporting Service
(717) 665-4060

**Page 53**

A. I believe -- I don't believe I did. I wanted to pull the video first to review the video -- and review the reports, to see if there was any discrepancies.

Q. All right. And did you find whether there were discrepancies?

A. Yes.

Q. Okay. What were they?

A. The reports didn't accurately reflect the video with regards to finding an object within the cell.

Q. What did you observe on the video?

A. I observed the officers going in, doing a check for approximately, I think three or four minutes. When they came out, Officer Christner was holding a, what appeared to be a white sheet, which he took down to the officers desk area.

Q. What limitations, if any, do inmates on MHU have with regard to bed clothing?

A. If they're on like a, if they're on suicide status specifically, they would be restricted to certain items.

If they're on just an observation status, more than likely they probably wouldn't be restricted

Keenan Reporting Service
(717) 665-4060

**Page 54**

from any items.

Q. What about Suicide Status II?

A. Yeah, they would be restricted from certain, certain items.

Q. Such as?

A. It could be, you know, like personal items in the cell. Like a toothbrush and stuff like that. Any, like sheets. They might have a, their blanket might not be the typical blanket they would get. It could be a suicide, what they call suicide proof type blanket. So certain precautions are taken with regard to what they can and cannot have.

Q. Okay. So the sheet that you saw on the video, was that a sheet that was permitted for someone on Suicide Status II?

MR. DIDOMENICIS: Objection. On Suicide Status II, Kevin?

MR. ALLEN: Yes.

MR. DIDOMENICIS: Note my objection to the form.

THE WITNESS: Not, no. I don't believe so.

BY MR. ALLEN:

Q. I'm sorry. That would not be a

Keenan Reporting Service
(717) 665-4060

**Page 55**

restriction?

A. I don't believe so.

Q. Okay.

A. Or, excuse me. On Suicide Status Level II? Excuse me. Yes, I believe that would be a restriction. If they were on Suicide Level II.

Q. So put it in other terms then, an individual on Suicide Status Level II, would they or would they not be permitted to have the sheet that you saw on the video?

A. I do not believe they are permitted.

Q. Okay. How about a pillowcase, are they permitted to have a pillowcase?

A. No. I don't believe -- if they're on Suicide Status Level I or II, I don't believe that they're permitted to have a pillowcase either.

Q. When individuals are housed on MHU, if they were on a suicide status, are they housed with other inmates who have the same status or a different status or does it matter?

A. Normally when they're placed -- if they're on Suicide Status Level I or II, normally they're placed in a camera cell that's located in a particular part of the medical housing unit. And the

Keenan Reporting Service
(717) 665-4060

**Page 56**

checks go from like a 30-minute normal check of the unit to a 15-minute check. And the officers have direct line of sight via their station, as well with regards to videocameras.

Q. Okay. Now if an individual is on psychiatric observation, which is Level III, is that right?

A. I believe so, yes.

Q. Okay. Do they have any restrictions with regard to their ability or, I'm sorry, with regard to bed clothing in the cell?

A. I don't believe so, unless it's brought up by the mental health person for a specific restriction. But normally no, it's just an observation status.

Q. Are they restricted with regard to how many sheets they can have?

A. Yes. I mean, each inmate I believe is provided, I believe one sheet and normally a pillowcase and a blanket. If they have -- or maybe two sheets, possibly. I can't really recall.

But there is a minimum -- or there is -- they can't have an overabundance of a specific item. Once in awhile you'll find that an inmate leaving will

Keenan Reporting Service
(717) 665-4060

57

to give his blanket to another person, that type thing. But that's not permitted.
Q. What's an overabundance?
A. More than what they're permitted to have.
Q. And you're not sure exactly what that [n]umber is?
A. It believe it was one blanket and it [m]ight have been two sheets.
Q. Okay. If an individual's on psychiatric [ob]servation, are they typically housed with another [in]dividual in the same status or does it matter?
A. It could be that way. I know that at a [po]int in time the thought was somebody on observation [st]atus, to be in with another person might be critical [t]o their well being with regards to -- so if somebody [is] there like monitoring or watching, not saying the [in]mate is supposed to do that, but it gave them [s]omebody to talk to, versus lingering in there by [t]hemselves.
Q. If a correction officer were to hear from [a]n inmate that his cellmate was tearing sheets, what [i]s the correction officer supposed to do?
A. The correctional officer should go to the [c]ell, search the cell, to see if they could find the

Keenan Reporting Service
(717) 665-4060

58

[i]tem.
Q. And then what?
A. If they find the item, they confiscate [t]he item. Depending on if the person is on status, [t]hey should make notification to the supervisor's office, a written report. And also to, if -- psychiatric, to MH/MR.
Q. What if they don't find anything?
A. If they don't find the item specifically in that cell, then they still need to make notification to the supervisor's office and MH/MR, so somebody can talk to that person to, just to see if there's anything going on that -- you know, it could be the roommate trying to set them up. But then again, it might not be. You know.
Q. Who is supposed to make that assessment?
A. The officer on round.
Q. Is supposed to assess whether the cellmate is trying to set the other cellmate up?
A. Well, no. Just to make that determination of notification.
Q. Okay.
A. And then whoever comes down to talk to them, whether it be MH/MR or even the supervisor,

Keenan Reporting Service
(717) 665-4060

59

1 would make that determination.
2 Q. So whether they find this item or not,
3 does that change the corrections officer's reporting
4 responsibility?
5 A. No. They would still need to report,
6 because the information came from another inmate that
7 this guy was ripping sheets or whatever. They may not
8 have found it, okay? But that doesn't mean he wasn't.
9 It just means that we didn't find it.
10 Q. Okay.
11 A. But we, you know, but it still has to be
12 looked at and notification still needs to be made.
13 Q. And how would a corrections officer make
14 that notification then?
15 A. By phone or radio to the supervisor's
16 office, by phone to medical or MH/MR, and they should
17 document it on the pass-on book.
18 Q. Okay. What about in an unusual activity
19 report, is that required?
20 A. The same thing, unusual activity report.
21 Yes.
22 Q. Is that required, whether they found an
23 item or not?
24 A. Correct.

Keenan Reporting Service
(717) 665-4060

60

1 Q. Okay. How about in a case where a
2 cellmate is alleging that his cellmate wanted him to
3 choke him out, would that require completion of an
4 unusual report?
5 A. Yes. That's a reporting requirement.
6 Q. Okay. And how are the officers notified
7 that that is a reporting requirement, how do they
8 know that?
9 A. Through initial training for unusual
10 activity reports. It's just something that's not
11 standard day-to-day activity. If somebody comes up
12 and says, hey, my cellmate wants me to choke him out,
13 you know, it's not normal. You know. So there should
14 be a report made.
15 Q. What is the standard, in general, for
16 preparing an unusual activity report?
17 A. Anything, any information that comes
18 across to you that is unusual, then you would report
19 it.
20 Q. Okay. Would the same be true then if an
21 inmate notified the corrections staff that his
22 cellmate was banging his head against the wall?
23 A. Yes.
24 Q. So you said you reviewed the video. When

Keenan Reporting Service
(717) 665-4060

93

Q. So if an individual, and this is a hypothetical. Let's say an individual is actively attempting to harm himself, what is the -- what role would the security officer take?
A. They should make notification via radio. Again, it depends on the situation at that time. If I was at cell -- let's say I'm walking past a cell. I would see somebody trying to commit self-harm. I would make notification via radio to get other people down. You know, it might be calling a code. Code Blue. It could be a Code 13. And go in there -- just to get people down there. Go in there and try to physically restrain that person from committing self-harm.
  But again, it all depends on what the issue is. If a person is in there with a shank and he just cut his wrist, I might have to wait for backup because my chances of going in there and getting shanked is pretty high.
Q. Right.
A. So it's all quick decision making at that particular time. And not every incident is the same every time.
Q. Right. So an allegation from someone

Keenan Reporting Service
(717) 665-4060

94

else that an inmate is trying to harm themselves, that's, and I think you went through this, and I don't need you to testify again, but that is something that would warrant notifying a supervisor or writing an unusual activity report?
A. Yes.
Q. And I think you said, notify MH/MR?
A. Correct.
Q. And the notification to MH/MR, is it notification by a phone call or a written report?
A. Well, normally it would be a phone call. Again, it depends on the situation. But normally it would be a phone call or a phone call to the supervisor saying, hey, you know, we need somebody here. And a supervisor may make contact.
Q. Does the corrections officer on MHU have the ability to email MH/MR?
A. I don't recall whether they had computers down there at that particular time. I know at some point in time they were getting computers in to be able to review things and, but I'm not sure whether they were in at that particular time.
Q. Were they there a year before you left?
A. I can't recall. I know they were in the

Keenan Reporting Service
(717) 665-4060

95

process of trying to get more computers in, but I'm not sure whether they were there at this particular time.
Q. Okay. So you talked to Corsiglia, Christner, Bonnie Bair, John Wickizer and Denise Sipe. Did you speak with anyone else about this incident?
A. On the -- from the 26th? I don't believe I did. Not that I can recall.
Q. How about inmates?
A. I may have spoke to a couple inmates to try to acquire reports, or I could have had Mr. Barley require reports from inmates.
Q. Did you acquire reports from inmates?
A. I believe we did acquire some reports.
Q. And did you receive a report from Mr. Beattie?
A. Yeah, I think there were a couple inmate requests forms in here.
Q. It's at 840.
A. Yeah, this would have been the general request form. And it looks like Officer Barley helped with that.
Q. Okay. So, I mean seeing this report and

Keenan Reporting Service
(717) 665-4060

96

the note from, it looks like Lieutenant Ritter, do you know whether you actually spoke to Seth Beattie?
A. I can't recall.
Q. Okay. I'll refer you then to LCP 839. Right there. So what is this?
A. This is a cell inspection report. When they do a cell inspection they are supposed to notate what cell the inmates are in. And the checklist on the bottom side here, they would check off on that.
Q. So for cell 2041, it looks like that is the cell for Zachary Keifer and Seth Beattie; correct?
A. Um-hum.
Q. Yes?
A. Yes.
Q. So do you know if this document reflects just the standard search or is this the search that was prompted by the statements of Seth Beattie?
A. This would be any search.
Q. I see.
A. Any search that they would have done to the cell they would have notated it on here.
Q. Well, how many times did they search the cell on December 26th?

Keenan Reporting Service
(717) 665-4060

97

A. I know there was, I believe it was twice. cause I believe Officer Christner said he had just searched the cell beforehand. And the video showed that he did it -- like a 30-second search. He was in and out like within 30 seconds.

And then they went back. After Inmate Beattie had made a comment to Officer Corsiglia, then when they went back in a second time, then both Officer Corsiglia and Christner took about three minutes to go through.

Q. Do you know whether this sheet, 839, reflects the first or second search?

A. No, it doesn't indicate.

Q. Now at the top of this page it says, 0800 to 1600.

A. Yeah. That would be second shift.

Q. Okay.

A. 8 a.m. to 4 p.m.

Q. All right. So when the word "second" is up there, it doesn't mean the second search, it just means second shift?

A. Correct.

Q. And in this one, the search, anyway, it appears to indicate that they had trash removal. Is

Keenan Reporting Service
(717) 665-4060

98

that right?

A. Correct. Trash removal. Verbal warning.

Q. Did you discuss this cell inspection report with the officers?

A. I think Officer Christner at some point had made a comment with regards to that there was some minor trash. And it was a verbal warning. There was no need -- I think it went back to the issue of, he felt there was no need for a report, or like a misconduct or a written warning or anything along that line there. But yet, they didn't, but yet the report reflected they didn't find anything.

Q. Okay. By the way, if they had found a ripped up sheet is that something that would require a written warning to the inmate?

A. It could. It could. But the -- based on the information that was received by Inmate Beattie, there should have been notifications made.

I mean, you have a -- have a guy that's talking about choking himself out or wanting to black out. And you have an inmate saying, hey, he's tearing a sheet up up there. You don't typically tear a sheet up for just nothing.

And if you go up there, based on that

Keenan Reporting Service
(717) 665-4060

99

information, and you find a torn sheet, then there should be notifications made.

I mean, secondary, you know, following that, you could say, hey, you know, we found that in there. It was contraband. You can give them a written warning. You can give them a verbal warning as well, you know. You know. But based on the aspect of why you went in there to search the cell to begin with, that information, that was a little more critical than just going in and just doing a regular search and just finding a torn sheet.

Q. You said the initial search was a 30-second search. How long are these searches supposed to take?

A. Well, 30 seconds is very quick. You know, when you're by yourself and you go into a cell and do a 30-second search, that's pretty quick to search everything.

Q. What do you do on a search?

A. Well, you should be looking under the bunk, you should be looking through some stuff, looking at the clothes, checking the mattress out, checking the windows, checking any caulking around the windows.

Keenan Reporting Service
(717) 665-4060

100

What you are doing is just observing the cell and observing if there is stuff there that they shouldn't have or if they've been tampering with anything. You know, 30 seconds is pretty quick.

Q. Okay.

A. I mean, you just had two officers go in there and do a three-minute search with two officers after the fact.

Q. Is that a typical time for a thorough search?

A. With two officers in there, three minutes, that's -- I mean, it seemed like they were going through everything, based on what you could see through the door. But for one person, you know, you need to take your time. You know.

Q. By the way, when two officers are conducting the search of a cell in MHU does another officer have to be on the block to cover the desk?

A. There should be. There should be somebody out, out and about.

Q. Do you know --

A. There may have been, I don't recall. There may have been somebody at the desk possibly. I don't recall.

Keenan Reporting Service
(717) 665-4060

101

Q. All right. Do you recall whether you spoke to an officer about, that may have been on the block, other than those two officers on December 6th?

A. Not that I can recall, no.

Q. Okay. Did you interview a Jason Walters, another inmate, concerning this incident?

A. I don't recall.

Q. Just before I forget about it. You mentioned something about caulk. Now was there a move within the prison system to caulk that area between the bunk and the wall?

A. I believe so. They were, at a point in time, they were trying to do what they can to make cells somewhat suicide proof. And they, they were looking at different avenues of where they can tie off or, you know, if they attempt to hang up and that type of thing.

And there was a -- I want to say they talked about a pick-proof type of caulking, like a caulking that you couldn't really tear out or pick out.

There was some welding that was being done. I know over the years with regards to the slats

Keenan Reporting Service
(717) 665-4060

102

on the bunks, there used to be the squares. They were trying to get rid of them down in the medical housing unit.

They were just -- they were trying every avenue they could think of to make them suicide proof.

I've already seen guys hang themselves by tying a sheet around the nozzle to the water fountain on the sink and just sitting on the rail and leaning forward.

So, you know, you do what you can. But it always seems that somebody finds a different way.

Q. Let me just show you now -- I'm sorry, I didn't make a copy, but they're in the packet. Pages LCP 938 through 942.

MR. DIDOMENICIS: 938 through 946?

MR. ALLEN: Yes.

MR. MACMAIN: 938. (Indicating.)

BY MR. ALLEN:

Q. Okay. In looking at these pages, 938 to 942, first of all, can we agree that these are the photographs taken after Mr. Keifer's suicide?

A. Yes.

Q. And am I correct that he has looped a sheet around the upper bunk?

Keenan Reporting Service
(717) 665-4060

103

1  A. Correct.
2  Q. So the caulk that was proposed, was this
3  caulk to go between the upper bunk wall and upper
4  bunk?
5  A. Yes.
6  Q. Okay. Do you have any idea why the caulk
7  was not installed?
8  A. No.
9  Q. Do you know who requested that that caulk
10 be installed?
11 A. No.
12 Q. Were you involved at all in that program
13 or move to get it installed?
14 A. No. Typically that was done above my pay
15 grade, along with MH/MR, you know, discussing, again,
16 just looking at certain things that could be done
17 differently.
18        You know, from -- I remember when we, you
19 know, in certain cases we went from the normal
20 mattresses and the pillows, to the mattress and pillow
21 all being one.
22        I remember years ago we went from the
23 normal sheet or normal blankets to the suicide proof
24 blankets. And I think, you know, I mean the more you

Keenan Reporting Service
(717) 665-4060

104

1  try -- put it this way. The more you try to suicide
2  proof as much as you can, and like I said, where I
3  thought some cells that, you know, were as good as you
4  can get it at one point, there's always, like I said,
5  I've seen a guy hang himself off the side of his water
6  fountain. And I would -- if you had asked me could
7  somebody do that? I probably would have told you no.
8  There's just no way that it would have sustained the
9  weight.
10 Q. So the cell that Mr. Keifer was in when
11 he hung himself, was that, did that have one of those
12 mattresses with the built-in pillow?
13 A. I'm not sure. I don't recall.
14 Q. Would there be any need for a pillowcase
15 in a room that had that type of mattress?
16 A. No.
17 Q. So the room that he was in, when the cell
18 search was done, do you know if that room had the
19 single setup, the mattress and the pillow in one?
20 A. I'm looking at the pictures and it looks
21 like a blue mattress. The standard mattress actually
22 -- the standard mattress was green. And if you look
23 at 936, the cell, it appears to be the one with the
24 pillow in the mattress.

Keenan Reporting Service
(717) 665-4060

105

Q. Now understanding this is the cell where e hung himself, this is not the cell that was earched?
A. Correct.
Q. So do you know, as you sit here today, whether that cell where he was, 41 cell, had a single mattress unit or was it a separate pillow?
A. I'm not certain whether they switched out li, in the medical housing unit, all the mattresses ut or not.
Q. Okay. Now I know you said you are not ure whether you interviewed the inmates. We talked bout Inmates Beattie and Waters. Did you interview ny inmates, do you recall?
A. I want to say I think I may have talked o Mr. Beattie at one point. Mr. Walters, I'm not ure of. I don't recall.
Q. All right. How about Brian Hummel? Did you speak to Brian Hummel?
A. I don't recall.
Q. How about a Mario Mitchell?
A. I'm not sure.
Q. Were there any other aspects of your investigation that we didn't cover?

Keenan Reporting Service
(717) 665-4060

106

A. No. I think we covered it. One thing that came to my mind was that first search, the 30-second search.
Q. Yeah?
A. But we covered that, so.
Q. Okay. Did you see a video of that first search?
A. Yes. I preserved -- that was preserved as well.
Q. When an inmate would be given a warning, as is indicated on that one sheet, is that a written warning or a verbal warning?
A. No. Even if it was a verbal warning, it should have been notated on the inmate's card. Each inmate has a card that shows like different things that are going on. Whether it be a verbal warning, a misconduct. It could be, keep an eye on this guy. I mean, but each inmate has a card in every housing unit. So if there was a verbal warning or a written warning, it still would have been written or annotated on that card.
Q. The cell search form that I showed you, and I lost the number again, is that collected every day or where does that document stay?

Keenan Reporting Service
(717) 665-4060

107

1 A. That would end up going to the
2 supervisor's office at the end of the day with the
3 paperwork.
4 Q. And an indication that an inmate was
5 given a warning, would that warning form go to the
6 supervisor as well?
7 A. No. The card -- now if it was a
8 misconduct or a written warning, then that would have
9 been done, that would have been a notification. But a
10 verbal warning would have just been annotated on the
11 card that the inmate would have in the unit, that the
12 officer would have access to.
13 Q. All right. You said you looked at other
14 videos. And you already mentioned one, I think,
15 where you said -- another video that one of the
16 officers was holding this, whatever in his hand?
17 A. Yes.
18 Q. Other than that one other video, were
19 there any other videos of importance that would
20 indicate what was found in Mr. Keifer's cell?
21 A. Not so much what was found. Again, going
22 back to the camera outside of the medical housing
23 unit, looking in, I kind of recollect I thought the
24 inmate was, like, reissued something.

Keenan Reporting Service
(717) 665-4060

108

1 Q. Okay.
2 A. Because he, I believe, if I remember
3 correctly, he followed the officers down to the
4 officer's desk area, Inmate Keifer. And I thought he
5 was reissued something.
6 But it was, it was, the film captured
7 from the camera outside the housing unit where you
8 have MHU, G2, G1. And looking kind of through the
9 window. It's kind of a heck of a shot. But it --
10 that's what it appears to be.
11 Q. Now you saw where this video ended, the
12 one that I have with me.
13 A. The one we watched.
14 Q. The one we watched.
15 A. Yes.
16 Q. Did this camera shot continue to record
17 after this scene ends on the video that I have?
18 A. I don't recall. I don't -- I don't
19 think. I think it cuts off there. And then we --
20 what we would do is take that camera shot from there,
21 what we are watching is the officers doing their
22 thing, heading back down to the officer's desk. And
23 then we acquire another camera to get them where they
24 start going down the steps on this film, and we're

Keenan Reporting Service
(717) 665-4060

### Page 109

ying to put that puzzle together, if you will, from camera shot standpoint.

Q. I was just curious if there is a video that would show Mr. Keifer walking back to his cell with whatever he was issued?

A. There could have been. There may have been. Because if, like I said, if I remember correctly, he was reissued. Again, I don't recall whether it was actually in this case, if it was Mr. Keifer, one was reissued, or I believe to be reissued, and that film is there, then I would have backtracked back to that cell and there would be a download of that video for him going back.

Q. Okay. In your report there are several pages that mention different videocameras. Let's go to LCP 801. It looks like an email from Robert Barley?

A. Yes.

Q. On December 29, 2014.

A. Yes.

Q. There's a reference to different videocameras. What do those numbers mean?

A. Actually, he has a typo in here. It's DIBOS. Each camera has a number to it that would tell

Keenan Reporting Service
(717) 665-4060

### Page 110

us what area, what area it would be located in and what it may be a shot of.

When we had those cameras installed, we tried to -- what we did is went through each one. And I used to have a listing on my computer that I could go to. Say there was a code in MHU at such and such a time. I could go to that listing and say, okay, that is DIBOS 5 camera, whatever. And I, I was able to pull that up because I had access, direct access to the DVR system.

Q. Okay.

A. There was a specific room that had a multitude of DVRs for all the cameras within the facility. And there were only certain people who had access that. I was one. Robert Barley was another. And then the person he's talking to, more than likely we were trying to acquire some information.

Q. But you don't know, you wouldn't know, as you sit here today, what numbers those are?

A. Not offhand, no.

Q. Okay. There's one other email I wanted to ask you about here. Okay. I'm going to refer you to 795 and 796. I'm specifically going to refer you to 796. "Just as an FYI - I know this inmate is

Keenan Reporting Service
(717) 665-4060

### Page 111

housed in MHU. Magisterial District Justice Stoltzfus called me and informed me this morning that when he was in court yesterday he was coming down off of heroin and was making statements of self-harm as well as that he would like the police to shoot and kill him."

Would you agree that appears to be authored by Christina Fluegel, F-L-U-G-E-L?

A. Yes.

Q. So were you copied on that email? It appears you were. Right there.

A. Yeah, I'm looking at it. Yeah. Yes.

Q. And what about mental health staff?

A. Yes.

Q. What about the physicians, Dr. Cattell or the other physician?

A. I wasn't sure of the physician's names.

Q. How about Mr. Turgeon, the psychiatrist?

A. It doesn't appear.

Q. So is there a policy within the prison that you may recall that says who is supposed to get those emails if an individual is threatening suicide?

A. If it's a DOJ, then whoever is on the DOJ list. This wasn't a DOJ. This was just information

Keenan Reporting Service
(717) 665-4060

### Page 112

that the records officer, when a person came back from a hearing, received -- somebody gave her that information. She then wrote the medical department and other people that, you know, hey, just FYI. And then a responding nurse, it looks like Tanya Young, said -- advised, he was on detox protocol and Suicide Status Level I.

Q. Is there any requirement that you know of that the psychiatrist be notified?

MS. MINEHAN: Objection to form.

BY MR. ALLEN:

Q. Is there any requirement that you know of that the psychiatrist is to be notified if the prison receives an outside notice that an individual is threatening self-harm?

A. Typically medical would be notified, and MHR. And then MH/MR would make that determination.

Q. How about with regard to the psychiatrist specifically?

A. Not on like our end, specifically. It would be the medical MH/MR and they would take, make that notification.

Q. So what did you do as a result of your investigation?

Keenan Reporting Service
(717) 665-4060

113

A. Conclusion wise, I made several referrals with regards to possible disciplinary action for infractions that were, you know, made between officer Corsiglia and Officer Christner.

MR. DIDOMENICIS: Just let me note my objection. And I'll put this on the record without interrupting the witness. But I object to any conclusions drawn by Mr. Klinovsky as well as his recommendations. He is here as a fact witness, so I don't believe his opinions would be admissible.

You can answer the question.

THE WITNESS: Okay. So basically what I did is I referred. Like I said, I don't make any determination on the disciplinary action, I just make referrals to the warden or the District Attorney's Office. And this is all to the warden anyway. And I made a referral for disciplinary action for the warden to review that. And also, based on the case, the District Attorney's Office for any criminal review.

And again, that would be left up to the warden in the end to make that determination, or if it was going to be forwarded.

BY MR. ALLEN:
Q. Did you note any infractions of the

Keenan Reporting Service
(717) 665-4060

114

employee manual?
A. Yes.
Q. And are they listed on page five of your report at LCP 790?
A. Five and page six.
Q. Okay. So can you tell me first what they mean? So what is ability?
A. It's the ability of the officer to do their job, is what it boils down to. In this case here, again, it was about not submitting the report. I mean, what I consider simple tasks. You know, submitting the report. Making the proper notifications.
Q. And what's the alertness infraction?
A. Again, this goes back to the officers' alertness to make those judgments that, you know, based on the information they got, based on what they found, to make those proper notifications and the proper reports.
Q. What made you think that what the corrections officers removed from Mr. Keifer's cell was a sheet?
A. The way it was rolled up. It was rolled up. It was thicker than a t-shirt. It was thicker

Keenan Reporting Service
(717) 665-4060

115

than the norm. I know he said later on about a pillowcase, but it just seemed thicker than that.

And then there are strands. If you look close enough on the one video there were strands coming off of what I believe to be a sheet.

Q. And how did the conduct of Mr. Corsiglia and Mr. Christner affect the safety of Mr. Keifer?
A. The issue was, the information that was received, what appeared to be found, okay? There was, the proper notifications weren't made. Okay?

Again, my belief or my conclusion is that if those tasks were completed the way they should have been completed, then the supervisors and mental health would have taken steps to meet with Mr. Keifer to make a determination of what, what if any status he would have been placed on, based on the information.

He may have been placed on status. He may not have. I don't know that. But the thing about it is, it would have sparked a direction, you know, based on the information. And more so on the 27th, the fact that he was found hanging. And that information to me was important on the 26th. You know.

It's one of those things where based on

Keenan Reporting Service
(717) 665-4060

116

the investigation you have one side saying, hey, we told them. We have the other side saying, no, you didn't. We didn't have that information.

But yet, we didn't have any reports. We didn't have any -- there's no record, written record or verbal record to the supervisors or anything that any action was taken on the 26th.

Q. Your recommendation at the bottom of the page says they didn't investigate fully. What additional investigation should the corrections officers on MHU have done?
A. They got the information from Inmate Beattie. And there was a point in time where I believe it was Officer Christner said, well, inmates do this all the time. And in one part, yes, he's right. There are some times inmates will fabricate things to get a cellmate moved, in trouble. I mean, it does happen.

However, you know, you have -- you are looking -- I look at it as a puzzle. You have an inmate saying, hey, this guy is ripping sheets up in a cell. You have two officers going to search the cell and find something torn in there, or what appears to be a sheet. And you have officers saying that they

Keenan Reporting Service
(717) 665-4060

117

1  didn't find anything, but yet the video shows
2  differently.  There's an issue there.
3  And with that said, okay?  That's -- they
4  didn't really talk to Keifer.  They just kind of, I
5  hate to say it, they kind of blew it off and said,
6  hey, this is trash and we're just going to give you a
7  verbal warning.
8       Q.   Just one last thing.  Your report, does
9  your written report end at page six?
10      A.   Yes.
11      Q.   Do you typically sign these reports?
12      A.   I normally initial them.  I normally
13  initial them in the front.  But this doesn't look like
14  it's been initialed.
15      Q.   Is this your report, however?
16      A.   Yes.
17      Q.   And I know there are two more packets of
18  the investigation report noted.  I don't think I have
19  -- did you look at those?  You said you skimmed them?
20      A.   Yeah, I scanned over them.  Yeah.
21      Q.   Okay.  Did they appear to be the full
22  report that you prepared?
23      A.   Yes.
24      Q.   Any documents you know of that were

118

1  missing from there?
2       A.   Not that I could see.
3            MR. ALLEN:  Okay.  Thank you.  No other
4  questions.

EXAMINATION

BY MS. MINEHAN:
5       Q.   I just have a question about an acronym
6  you mentioned.  MH/MR.  What you referring to?
7       A.   Mental Health and Mental Retardation.
8  That would be like John Wickizer.  It's just, that's
9  what we've utilized since I worked in the prison
10 system.
11           MS. MINEHAN:  Thank you.
12           MR. DIDOMENICIS:  I have few questions
13 for you, Mr. Klinovsky.
14           THE WITNESS:  Yes, sir.

EXAMINATION

BY MR. DIDOMENICIS:
15      Q.   First of all, when you first viewed the
16 videos what size screens were you viewing them on?
17      A.   Then it would have been, how can I say
18 it, larger than that screen there but not as big a
19 that screen over there.  (Indicating.)
20      Q.   You're pointing to the court reporter's

119

1  laptop.  So it's larger than a laptop screen?
2       A.   Yes.
3       Q.   And smaller than a TV screen?
4       A.   Yes.
5       Q.   Would it have been a monitor that was
6  used solely for that purpose or was it your computer
7  monitor?
8       A.   We had -- yeah, I had two monitors but
9  they weren't like your typical small monitors, they
10 were a little bit larger for the purpose of being able
11 to look at the videos.
12      Q.   Have you ever had experience with an
13 inmate asking to be choked out for sexual
14 gratification?
15      A.   I've heard of that.  I don't have any
16 direct experience with that, but I've heard of that.
17      Q.   Yes.
18      Q.   What's the size of the sheets that are
19 issued for those cells?
20      A.   They're kind of a standard, like a twin
21 size, I guess you would say.
22      Q.   Can you approximate the size for me?
23 Like a twin bed?
24      A.   Yeah.  Like a twin bed sheet.

120

1       Q.   And it was a flat sheet, not a fitted
2  sheet?
3       A.   Correct.
4       Q.   And what about the pillowcase?
5       A.   Pillowcases are just your normal size
6  pillowcases for just a standard pillow.
7       Q.   Now the search of the cell that was done
8  by both Corsiglia and Christner, you would agree that
9  that was an appropriate search under the
10 circumstances in terms of length of time?
11      A.   Yes.
12      Q.   On the day of the attempted suicide by
13 Mr. Keifer, are you aware that they only found one
14 sheet in his cell?
15      A.   I can't recall.
16      Q.   But considering that he was on psych
17 observation, which is status III, he would be
18 entitled to have a sheet as well as a pillowcase; am
19 I correct?
20      A.   From what I gather he was verbally taken
21 off of that by Mr. Wickizer and he was to be placed in
22 general population.  It was just -- there was a lapse
23 between the time the officer was verbally notified and
24 the email went out.