# Exhibit M

```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2

 3

 4   KATHY KEIFER, Administratrix of the :
     Estate of ZACHARY KEIFER,
 5                                              :
                    Plaintiff,                  : Number
 6                                              : 5:16-cv-06620-JFL
             vs.                                :
 7                                              :
     LANCASTER COUNTY, PRIME CARE               :
 8   MEDICAL, INC., JOHN W. WICKIZER,           :
     DENISE SIPE, MARK TURGEON, WILLIAM         :
 9   CATTELL, MATTHEW CORSIGLIA, JEFFREY        :
     CHRISTNER, BRIAN MCCORMICK, WILLIAM        :
10   MORNINGSTAR and BRYAN ACHEY,               :
                                                :
11                  Defendants.                 :

12

13
             The deposition of DENISE SIPE was held at
14   the office of Marshall Dennehey, 100 Corporate Center
     Drive, Suite 201, Camp Hill, Pennsylvania on Monday,
15   May 14, 2018 at 3:00 p.m., before DEBRA ROSE KEENAN,
     Professional Court Reporter and Notary Public.
16

17

18                        - - - - -

19

20

21              KEENAN REPORTING SERVICE
                    Debra Rose Keenan
22                 4917 Elizabethtown Road
                Manheim, Pennsylvania 17545
23

24
```

```
 1   Later, afterwards, I kind of inquired about him a
 2   little bit, just on my own.  Because like I said, he
 3   had a familiarity that -- but that was it.
 4        Q.     When you say you inquired more on your
 5   own, who did you inquire to?
 6        A.     I just asked if anybody had known he was
 7   there, but prior, because the regulars, so to speak,
 8   are there often, and to see if people know anything
 9   about him.
10        Q.     Who did you ask?
11        A.     It would have been the other therapists.
12        Q.     And did they have any experience with
13   him?
14        A.     They couldn't remember.
15        Q.     Okay.  Did you review any records
16   concerning Mr. Keifer?
17        A.     No.  I really don't know the system that
18   well.  I was just still learning it, so.
19        Q.     Did you have access to the records if you
20   wanted to review them?
21        A.     I could.  But my computer literacy is
22   really poor, so.
23        Q.     Okay.  Did you discuss the initial
24   evaluation -- I shouldn't say that.  Let me restate
```

1   Q.      Yeah.  Was Mr. Wickizer there that day?
2   A.      I don't believe so.  It was just Bonnie
3   and I at the time.
4   Q.      How did it come about that you saw Mr.
5   Keifer?
6   A.      The first inmate that I had seen had said
7   something that he heard that this guy, he referred to
8   him, this guy, who was I think a couple of cells down
9   from him, said he had been banging his head.
10          And so at that time I had asked the guard
11  if I could talk to him.  And I guess he got him ready.
12  And after I was done with the person I was talking
13  with, then I talked with Mr. Keifer.
14  Q.      Did a guard tell you that he was banging
15  his head?
16  A.      I knew that he was banging his head.  I
17  know that the guard -- that the inmate told me.  I
18  also know that the guard, when I said -- I did say to
19  him, is there a report of him banging his head?  I
20  know that he said sometimes cellies do that to get
21  someone off their tier or off their block.  Maybe he
22  didn't like him near his tier?  Maybe -- I have no
23  idea.  I was only there a few weeks.
24  Q.      He said that sometimes inmates will bang

1  Q. So what did you talk about?
2  A. I just sat down and asked him how he was
3  doing. We talked about the incident that had
4  happened. That's why I was there. And I asked him
5  how was doing. He said he was just dealing.
6  Q. Just?
7  A. Dealing. Meaning, like he's dealing with
8  it. I asked him what had been going on recently. He
9  had stated that he had talked to his mom earlier that
10 day. Things were looking really good for him on the
11 outside.
12      I asked him how it affected him, seeing
13 what he saw. At that time I didn't even know what he
14 saw, so I actually questioned, so, like, what
15 happened? And he just asked me, is the guy okay? And
16 I said, I think that he's okay. I haven't heard
17 anything. He was concerned, sort of like if you just
18 saw somebody get hurt and you're like, is that person
19 okay?
20      I asked him point blank, I said, so the
21 rumor is that you've been hitting your head on the
22 concrete. And he laughed. And he's like, no. And he
23 asked -- he didn't ask, I asked. I said, well, they
24 say you've been hitting your head. And he's like,

1  there's no reason for me to do anything to myself.
2  And he was using a lot of slang.  There's no reason
3  for him to do anything to himself because things were
4  looking good.  He was getting -- I guess things were
5  not good at one point with his mom, the way he
6  indicated.  But he was really happy that he got to
7  talk to her.  Things were looking good on the outside,
8  were lining up for him.
9       Q.    What do you mean, he was using a lot of
10 slang?  What was he saying?
11      A.    Well, just when you refer to different
12 cell people, people and different inmates in different
13 parts -- they use, they call them different words.
14 And I honestly don't remember the words they used, but
15 I know that the jargon was there.
16      Q.    You don't recall the words that he used?
17      A.    Not the slang.  It's not something that I
18 would typically -- cellies was one thing.  And then
19 there were other terms that I honestly can't remember.
20 I'm sure if I would hear them, I would know what it
21 is.  I mean, I know what they are.
22      Q.    Were they derogatory terms?
23      A.    Towards other people?
24      Q.    Yes.

| | | |
|---|---|---|
| 1 | A. | Sort of. Like, that person doesn't like |
| 2 | me. That's pretty much what it would amount to. | |
| 3 | Q. | Did he tell you whether or not he was |
| 4 | having any disputes with his cellmate? | |
| 5 | A. | No. |
| 6 | Q. | Did he have a cellmate? |
| 7 | A. | At that time I don't honestly remember if |
| 8 | he said yes or no. | |
| 9 | Q. | Did one of the corrections officers tell |
| 10 | you that Mr. Keifer had been banging his head against | |
| 11 | the wall? | |
| 12 | A. | Again, I don't know if I said it to him |
| 13 | or if -- the same person that I'm talking about, to | |
| 14 | Shiffer, he -- I said that the cellie -- another | |
| 15 | cellie said -- I shouldn't call him cellie, because | |
| 16 | that means they're in the same bunks. They're not. | |
| 17 | But another inmate said that he's banging his head. | |
| 18 | That's when he said, that's when other inmates will | |
| 19 | try to say things to get people off their tier or off | |
| 20 | their block. | |
| 21 | But I don't remember the order of events. | |
| 22 | I don't remember him actually saying that to me. I do | |
| 23 | remember we talked about it because he, I remember him | |
| 24 | telling me that -- and I saw him go around us. And he | |

1  said that he looked at his head and he didn't see any
2  bruising or anything.  I didn't see any bruising or
3  anything.
4      Q.    Did you examine his head?
5      A.    Not like this, but I can -- I've been a
6  hairdresser for many years.  And I can see someone's
7  scalp.  And if they're banging their head on concrete
8  hard enough to do damage, they're gonna have bruising.
9      Q.    Did you look at the back of his head?
10     A.    No.  But the guard said he went around
11 and he looked.  But I didn't see anything in the
12 front.  He turned his head to the side, so I would
13 have seen the right side of his face.
14     Q.    Who was the guard that said he looked at
15 the back of his head?
16     A.    Shiffer.
17     Q.    Did you have any conversations with
18 Corrections Officer Corsiglia?
19     A.    No.  I don't even know who that is.
20     Q.    How about Officer Christner?
21     A.    Oh, my gosh, that's who I'm talking
22 about.  Christner, I got their names mixed up.  I'm
23 sorry.
24     Q.    Okay.  So when you said Shiffer before,

1   that you talked about before --
2        A.    Sure.
3        Q.    -- that led you to believe he was okay?
4        A.    Sure.  Keifer was making direct eye
5   contact with me.  He was very laid back.  His body
6   language was open.  He wasn't closed off.  He answered
7   the questions directly.  His affect was appropriate.
8   He laughed appropriately.  There were no inappropriate
9   gestures, comments.  He spoke of his mother.  And he
10  smiled.  It was a warm, sincere smile when he spoke of
11  his mother.  You know, they had talked and things were
12  going good.
13            Just, those were the main things that I
14  remember.  And I remember him not shying away when I
15  asked him point blank.  He didn't take any time to
16  think about it when I asked him if he was banging his
17  head.
18       Q.    Did Mr. Keifer tell you that he was
19  feeling ill from detox?
20       A.    No.
21       Q.    So if Mr. Christner had told you that Mr.
22  Keifer was ripping up bed sheets, what would be
23  required of you?
24            MR. NINOSKY:  I think it's speculation

1  indication that he was banging his head.
2      Q.     If you were told that he was ripping up
3  sheets --
4      A.     I wasn't.
5      Q.     If you were told that, would you have
6  written it up?
7      A.     Yes.
8      Q.     All right.  If you were told that he was
9  asking others to choke him out, would you have
10 written a note?
11     A.     I wasn't.
12     Q.     I understand that.  But if you were,
13 would you have written it up?
14     A.     It depends on the follow through, what
15 that told me as well.  Like if I asked other people
16 what was going on -- just, I would have to have more
17 than him asking somebody to choke him out, only from
18 one person's hearsay.
19            I've got -- to be honest, there are so
20 many inmates who claim this about other inmates, that
21 we would have the whole area on suicide status.
22            Through my questioning with him, through
23 his answers, through the way he answered, through
24 asking if he saw any other bruising, I should say any

1  bruising, there was no indication at the time.
2           And that's too much of a speculation for
3  me to know what the what-ifs are.  They're not fair in
4  life because we don't know, you know.
5      Q.   Well, I was really just asking if you had
6  heard that he was asking someone to choke him out --
7      A.   No.
8      Q.   -- whether that would -- not whether you
9  heard it.  I understand you didn't.  But let me
10 finish that whole thought.
11     A.   Sorry.
12     Q.   I was asking whether, if you had heard
13 that, you would have been required to write a note?
14          MR. NINOSKY:  Asked and answered.  You
15 can answer it again.
16          THE WITNESS:  If it would have warranted
17 a note at the time, I would have written a note at the
18 time.
19 BY MR. ALLEN:
20     Q.   Okay.  Is the basis for whether it
21 warrants a note really whether you believe it
22 happened?
23     A.   No.  No.  No.  We take calls from people
24 outside of jail saying that, you know, somebody is

```
 1                And as far as speculating about if he was
 2   being choked out?  I honestly don't -- I cannot answer
 3   that in truth, because it did not happen.  And there's
 4   too much speculation.
 5                I don't know.  Maybe if there was
 6   somebody there to corroborate the other information,
 7   you know, things would have played out differently.
 8   But I wasn't given that information.
 9   BY MR. ALLEN:
10        Q.      Did you ask Mr. Keifer's cellmate?
11        A.      No.  No.  I didn't talk to any cellmate.
12        Q.      Did you ask anyone else, other than the
13   individual who initially gave you the information?
14        A.      That individual, I talked to the prison
15   guard, Christner, now that I remember his name right.
16   And he gave me his response.  So, yeah.  That was it.
17        Q.      Okay.  Did Bonnie Bair speak with Mr.
18   Keifer on the same day?
19        A.      No.
20        Q.      As far as you know did she ever speak
21   with Mr. Keifer?
22        A.      I would not know.
23        Q.      Did you ever speak to an inmate with the
24   last name of Beattie, B-E-A-T-T-I-E, with regard to
```