# Exhibit Q

```
 1                IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2

 3

 4    KATHY KEIFER, Administratrix of the :
      Estate of ZACHARY KEIFER,
 5                                        :
                      Plaintiff,          : Number
 6                                        : 5:16-cv-06620-JFL
                 vs.                      :
 7                                        :
      LANCASTER COUNTY, PRIME CARE        :
 8    MEDICAL, INC., JOHN W. WICKIZER,    :
      DENISE SIPE, MARK TURGEON, WILLIAM  :
 9    CATTELL, MATTHEW CORSIGLIA, JEFFREY :
      CHRISTNER, BRIAN MCCORMICK, WILLIAM :
10    MORNINGSTAR and BRYAN ACHEY,        :
                                          :
11                    Defendants.         :

12

13
              The deposition of WILLIAM D. CATTELL,
14    M.D. was held at the office of Marshall Dennehey, 100
      Corporate Center Drive, Suite 201, Camp Hill,
15    Pennsylvania on Monday, May 14, 2018 at 12:13 p.m.,
      before DEBRA ROSE KEENAN, Professional Court Reporter
16    and Notary Public.

17

18

19                      - - - - -

20

21
                      KEENAN REPORTING SERVICE
22                       Debra Rose Keenan
                       4917 Elizabethtown Road
23                   Manheim, Pennsylvania 17545

24
```

```
 1   medicine?
 2        A.    Yes, it does.
 3        Q.    And does it accurately describe all of
 4   your employment in medicine?
 5        A.    Yes.
 6        Q.    As well as your education?
 7        A.    Yes.
 8        Q.    All right.  Are you board certified in
 9   Pennsylvania?
10        A.    Well, board certification is not by
11   state.
12        Q.    Okay.  Do you have a board certification?
13        A.    I am not currently board certified.
14        Q.    Are you board eligible?
15        A.    I am board eligible.
16        Q.    In what area?
17        A.    Family medicine.
18        Q.    Have you ever been board certified in any
19   specialty?
20        A.    Yes.
21        Q.    In what?
22        A.    Family medicine.
23        Q.    I'm sorry.  Where were you practicing at
24   the time?
```

1  A.  In New York state.
2  Q.  Okay. So did your board certification
3  expire?
4  A.  My board certification was withdrawn due
5  to a disciplinary action.
6  Q.  Okay. And that happened in New York
7  state?
8  A.  Yes.
9  Q.  Okay. What was the nature of that
10 disciplinary action?
11 A.  I was working in emergency medicine at
12 the time. There were allegations of negligence by the
13 Office of Professional -- OPMC, Office of Professional
14 Medical Conduct. And there was an agreement that
15 resulted in three years of probation.
16 Q.  All right. At the time that that
17 disciplinary measure was imposed, were you licensed
18 to practice in New York state?
19 A.  Yes.
20 Q.  How about in other states?
21 A.  At that time I had an inactive license in
22 Pennsylvania.
23 Q.  Okay.
24 A.  So my only active license was New York.

1   Q.      Of Prime Care?
2   A.      I'm medical director of Lancaster County
3   Prison, employed by Prime Care.
4   Q.      Okay. And you've held that position
5   since March of 2013?
6   A.      Yes.
7   Q.      All right. Did you ever examine Zachary
8   Keifer?
9   A.      No.
10  Q.      Did you prescribe medications for him?
11  A.      Yes.
12  Q.      Why did you prescribe medications for Mr.
13  Keifer in this case?
14  A.      He was admitted to the Lancaster County
15  Prison during after hours when there was not a medical
16  provider on site. So as per the, our usual practice,
17  he was triaged by the nursing staff and found to be at
18  risk for withdrawal. And so I was on call at that
19  time. I received a call from the nurse and prescribed
20  the medications over the phone.
21  Q.      Did you ever examine Mr. Keifer?
22  A.      No.
23  Q.      Was that a common practice, that you
24  prescribe without seeing the patient?

```
 1        A.      Yes.
 2        Q.      Would it be the typical practice to
 3   follow up with the patient then after you prescribed
 4   the medication?
 5        A.      It would be the typical process for
 6   either myself or one of my colleagues to see them as
 7   soon as possible the next business day.
 8        Q.      Okay.  Did you ever follow up with either
 9   your colleagues or Mr. Keifer to determine the
10   effectiveness of the medications you prescribed?
11        A.      No.
12        Q.      And why not?
13        A.      Because he was under the care of other
14   providers at Lancaster County Prison.  My role in his
15   care was to get information from the nursing staff
16   over the phone, determine the best course of care
17   initially, and start him on that care.  And then
18   subsequent to that, he would follow up with other
19   medical providers at the jail.
20        Q.      Were you ever told that Mr. Keifer was
21   suicidal or had made threats of suicide?
22        A.      No.
23        Q.      Did you ever learn from the other
24   providers how effective the medication was in
```